UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA          *ORIGINAL*

Before The Honorable PHYLLIS J. HAMILTON, Judge

| | | |
|---|---|---|
| HADONA DIEP and RYUMEI NAGAO,) | | **Motion to Dismiss the** |
| | ) | **First Amended Complaint** |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | NO. C 21-10063 PJH |
| | ) | |
| APPLE INC., | ) | Pages 1 - 26 |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Thursday, August 4, 2022 |

**REPORTER'S TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS**

**APPEARANCES VIA ZOOM WEBINAR:**

For Plaintiffs:          Adelphi Law
                         2306 Wineberry Terrace
                         Baltimore, Maryland  21209
                  BY:    JOSHUA WHITAKER, ATTORNEY AT LAW

                         Conn Law, PC
                         354 Pine Street, 5th Floor
                         San Francisco, California  94104
                  BY:    ELLIOT CONN, ATTORNEY AT LAW

For Defendant:           DLA Piper LLP (US)
                         555 Mission Street, Suite 2400
                         San Francisco, California  94105-2933
                  BY:    ISABELLE L. ORD, ATTORNEY AT LAW

                         DLA Piper LLP (US)
                         6225 Smith Avenue
                         Baltimore, Maryland  21209
                  BY:    ELLEN E. DEW,
                         EMILY M. STEINER, ATTORNEYS AT LAW

Reported By:        Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

| | |
|---|---|
| 1 | Thursday, August 4, 2022                              2:32 p.m. |
| 2 | P R O C E E D I N G S |
| 3 | (Zoom Webinar) |
| 4 | --o0o-- |
| 5 | **THE CLERK:**  Calling civil case 21-10063-PJH, Diep, |
| 6 | et al. versus Apple, Inc. |
| 7 | Counsel making an appearance, please raise your hand and |
| 8 | please accept when it asks to be moved in as a panelist. |
| 9 | (Pause in the proceedings.) |
| 10 | **THE CLERK:**  Counsel, please state your appearances, |
| 11 | beginning with plaintiffs' counsel. |
| 12 | **MR. CONN:**  Good afternoon, Your Honor.  Elliot Conn, |
| 13 | Conn Law PC, for plaintiffs, Hadona Diep and Ryumei Nagao, |
| 14 | along with my co-counsel Joshua Whitaker. |
| 15 | **MR. WHITAKER:**  Joshua Whitaker, Adelphi Law, present. |
| 16 | **THE COURT:**  All right.  Good afternoon. |
| 17 | **MS. ORD:**  Good afternoon, Your Honor.  Isabelle Ord |
| 18 | on behalf of the defendant, Apple, Inc. |
| 19 | **THE COURT:**  Good afternoon. |
| 20 | **MS. DEW:**  Good afternoon, Your Honor.  Ellen Dew also |
| 21 | of DLA Piper on behalf of Apple, Inc. |
| 22 | **THE COURT:**  All right.  Good afternoon. |
| 23 | All right.  This matter is on for hearing on the motion to |
| 24 | dismiss filed by Apple. |
| 25 | And the motion goes to, I believe, all ten of the causes |

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    of action that have been asserted in the complaint.  And also

2    against the motion is as to plaintiff -- is it Nagow

3    [phonetic]?  Nagao?

4          **MR. WHITAKER:**  Nagao, Your Honor.

5          **THE COURT:**  -- Nagao, based upon the -- the

6    agreement.

7       Okay.  This has to do with a cryptocurrency wallet, I

8    believe.  Is that the correct nomenclature?

9          **MR. WHITAKER:**  That is correct, Your Honor.  I wonder

10   if this is going to be as confusing as a Bumble SuperSwipe.

11         **THE COURT:**  Oh, I don't -- yeah, it has the

12   potential, for sure.

13      But it looks like there are two preliminary issues, one

14   having to do with the Section 230 immunity, and one having to

15   do with the limit of liability provided by the -- I'll just

16   refer to them as the terms of use.

17      So those two preliminary issues could dispose of the

18   entirety of the case so I'd like to hear what you all have to

19   say about them.  And then, of course, there is argument as to

20   each individual cause of action as well.

21      All right --

22         **MS. DEW:**  Yes.

23         **THE COURT:**  -- so this is Toast Plus, not Toast

24   Wallet, that's at issue, right?  Or am I -- do I have those

25   confused?

1          **MS. DEW:**  You have that correct, Your Honor, yes.

2          **THE COURT:**  Okay.  Toast Plus.

3      Okay.  Now, it also seems that in terms of the plaintiffs'

4  allegations, the plaintiffs' allegations, they're -- they are

5  categorizing -- there are ten of them, there are ten claims,

6  but they fall into one of two categories.  All claims don't

7  fit into the same category as far as I can see.

8      One is the actual act of Apple -- Apple's own

9  misrepresentations about the App Store being a safe and

10  trusted place for people to post their apps and to buy apps.

11  Okay.  That's one.  Okay, that's conduct committed directly by

12  Apple.

13      And the other aspect of the claims appear to be that Apple

14  was negligent and responsible for allowing the un- -- the --

15  for authorizing or distributing what is a fishing or a

16  spoofing app, right?

17      So the argument appears to be that Apple is responsible

18  for everything the bad actors, the third-party bad actors,

19  did, essentially that Apple stands in the shoes of those

20  third-party actors and are responsible.

21      All right.  That's more derivative or a vicarious kind of

22  liability than Apple's direct statements itself.

23      So I think it's important that when we talk about the

24  causes of action, that they put be put into the right -- to

25  the right category.  Okay?

 1        All right.  So let's start first, though, with the two

 2   preliminary issues that we are all aware of.  And who's going

 3   to argue for Apple?

 4            **MS. DEW:**  Yes, thank you, Your Honor, Ellen Dew here.

 5        For purposes of dividing up today's argument, with Your

 6   Honor's approval, I will tackle the community --

 7   Communications Decency Act argument and my colleague Ms. Ord

 8   will address the balance of the arguments.

 9            **THE COURT:**  Okay.

10            **MS. DEW:**  All right.  Thank you, Your Honor.

11        Your Honor precisely went to the exact sort of crux of the

12   issue here, and that is that this case really circles around

13   plaintiffs' unfortunate interaction with a single third-party

14   app that Apple published on the App Store.  And app --

15   plaintiffs now seek to hold Apple liable for the misfortunes

16   that plaintiffs incurred when they uploaded their

17   cryptocurrency into that third-party app.

18        And looking to the allegations of the complaint itself and

19   the specific conduct that plaintiffs identify and attribute to

20   Apple here, it is clear that across all of the claims, the

21   plaintiffs seek to hold Apple liable as a publisher of content

22   created by another, and that puts Apple within -- for each of

23   the claims alleged here in the complaint squarely within the

24   immunity provided by Section 230 of the Communications Decency

25   Act.

1   Now, to confirm that, Your Honor, we look no further than

2   plaintiffs' own allegations.  We can start with the very first

3   paragraph of plaintiffs' complaint where they claim that Apple

4   allowed hacking by, quote/unquote, authorizing a malicious app

5   in the App Store.

6   Then they go on in paragraph 2 to say that Apple allowed

7   the application to remain in the App Store and failed to warn

8   plaintiffs and class members of a danger of the application.

9   Under the *Barnes* test from the Ninth Circuit and its

10  progeny, Your Honor, that is clearly conduct which seeks to

11  treat Apple liable as a publisher of content created by

12  another.

13  There is no allegation in the complaint that Apple

14  contributed to the content of the Toast Plus app.  There is no

15  allocation [sic] in the complaint that Apple did anything more

16  than review the app before it was allowed on the App Store

17  using its vetting process.

18  And so because of that, just as Your Honor decided in the

19  *Free Kick Master* case, without an allegation that Apple

20  contributed to the content of this application, the claims are

21  subject to the CDA's immunity.

22  With respect to this first count, the CFAA claim, the

23  plaintiffs allege that the wrongdoing there by Apple was

24  allowing the Toast Plus application to be distributed on the

25  App Store.  For both the federal and Maryland state Wiretap

1    Act case -- claims, the plaintiffs allege that the wrongdoing

2    there was intentionally allowing the Toast Plus application to

3    be distributed on the App Store or causing the fishing or

4    spoofing application to be published and distributed.

5        Even with respect to the UCL and CLRA claims that are

6    alleged in the complaint, Your Honor, the wrongdoing that

7    plaintiffs identify in their own allegations is offering apps

8    for download in the App Store and the unlawful or unfair or

9    fraudulent business practices that they allege are controlling

10   what applications may be sold or provided to customers through

11   the App Store through their rigorous vetting process.

12       Continuing on, even in the Privacy Act claims that

13   plaintiffs allege, they say that the personal information was

14   taken as a result of the distribution of the Toast Plus

15   application.

16       And closing it out, Your Honor, in the negligence claim,

17   they allege that Apple was negligent by failing to properly

18   vet the Toast Plus application before providing it to the

19   public.

20       Across the board, Your Honor, every single cause of action

21   seeks to hold Apple liable for content that it made available

22   on the App Store that was created by another.

23       There does not appear to be any dispute under any of the

24   other prongs of the *Barnes* test here, Your Honor.  There's no

25   dispute that Apple and the App Store qualify as an interactive

1    service computer provider.  And there is not any reasonable

2    dispute that this content of Toast Plus was created by anyone

3    other than a third party.

4        In fact, in their opposition brief to the motion to

5    dismiss, plaintiffs even concede that the Toast Plus

6    developers are, quote/unquote, thieves who made off with

7    plaintiffs' cryptocurrency tokens and units here.

8        So, Your Honor, for those reasons, we believe that all of

9    the claims are subject to dismissal based on the Section 230

10   of the Communications Decency Act.

11       Now, Your Honor pointed out something that came up I think

12   in the opposition which is that we believe in order perhaps to

13   evade the effect of the Section 230 immunity, plaintiffs

14   appear to be shifting their theory of the case somewhat to

15   allege that it's not Apple's publication of apps on the App

16   Store or a fail -- alleged failure in the vetting process that

17   led to their harm, but in fact Apple's own statements about

18   the App Store itself.

19       That is a different case than what's actually pled in the

20   complaint, in the amended complaint.  And so we do -- for

21   other reasons, we believe that all of the claims fail for

22   other pleading deficiencies that are fatal to those claims.

23   So we do not believe these are things that can be cured

24   through amendment.

25       But even if Your Honor, as Your Honor pointed out, has

1   questions about whether there's a distinction between Apple's

2   own statements about its App Store and Apple's publication of

3   content created by another, as I just went through, in all

4   claims, Your Honor, the conduct alleged is Apple's providing

5   content created by another which falls squarely within the

6   parameters of Section 230 immunity.

7      If Your Honor has any questions about that argument, I'm

8   certainly happy to address them, but I also, in the interest

9   of time, I know we have a lot of claims to address here, so

10  that's the gist of our -- our presentation on that element.

11      **THE COURT:**  Okay.  All right.

12      Ms. Ord, did you want to go to any of the -- the other

13  than the Section 230 argument?

14      **MS. ORD:**  Yes.  Thank you, Your Honor.  I will

15  address the balance of the arguments.

16      And just note for Your Honor at the beginning that I think

17  a lot of these claims end up bumping into the CDA anyway.  But

18  if Your Honor was to find for any reason that CDA did not

19  apply, then we believe that each of the claims has an

20  independent fatal defect that would require its dismissal.

21  And as Your Honor correctly pointed out, the terms themselves

22  may apply to bar these claims.

23      And maybe I'll start there for Your Honor and talk a

24  little bit --

25      **THE COURT:**  Okay.

1      **MS. ORD:**  -- about the terms since that's one of the

2   issues you asked us to touch on.

3      And to do that, I would say, first of all, that there are

4   terms and conditions that are applicable to both of the

5   plaintiffs in this case.  I think it's undisputed, based upon

6   the allegations of the complaint, the plaintiffs did enter

7   into those terms, two different sets of terms, but they're

8   essentially the same language.  One is the Japanese set of

9   terms for Mr. Nagao and one is the U.S. set of terms for

10  Ms. Diep.

11     However, if you look at what those terms -- [technical

12  issue with the Zoom audio] -- they clearly point out from the

13  beginning when you begin your interaction with the App Store,

14  the way that you get -- [technical issue with the Zoom

15  audio] -- terms and conditions is you have to agree to them

16  before you can integrate into and use the App Store.

17     So you know from your very first interaction that these

18  are the terms that will govern your experience within the App

19  Store.  And they contain a couple of important disclosures.

20  Those disclosures include a representation that Apple is not

21  responsible for the conduct of third parties when you engage

22  with them on apps and things that you choose to participate in

23  from the App Store.

24     Part of this again bumps into Ms. Dew's CDA argument, but

25  it's also a clear articulation that Apple is not responsible

1    for what happens with a third party once Apple is no longer a

2    part of that transaction, and that you are in fact proceeding

3    at your own risk when you engage with those third parties.

4         And if Your Honor were to find that those terms apply,

5    then we believe that that would bar all of the claims.

6         Now, Your Honor said at the beginning that there was

7    perhaps a way to break these claims down into two buckets,

8    those that might relate to Apple's conduct and those which

9    might relate to the plaintiffs' -- to the third-party conduct

10   of the malicious application.

11        I'd actually like to push back on that a little bit.

12   Because I believe the way that the complaint is stated, there

13   are tendrils of flavors in there of an idea that somehow Apple

14   has independent liability, but that's just not how these

15   claims are pleaded.  The complaint does not allege that Apple

16   has made any representation that is not true.  In fact, the

17   App Store is a safe and secure place and we stand by that.

18        And the experiences that plaintiffs have had have, for the

19   most part, been positive except for this one interaction with

20   a third-party application once it was no longer a part of the

21   transaction with Apple.

22        Plus, Your Honor, we believe that there are serious

23   Rule 9(b) issues here.  To the extent that anyone was going to

24   attempt to assert any kind of fraud-based claim against Apple

25   under any of these legal theories, they would need to meet the

1    heightened pleading standards of Rule 9(b), the who, the what,

2    the where, the when.  And while there are sort of throwaway

3    statements in the complaint that plaintiffs may have seen

4    certain statements over time, perhaps over a long period of

5    time without the App Store being a safe, secure place and a

6    place that you can enjoy using apps, there is not a single

7    allegation in the complaint that says what the plaintiffs

8    viewed, when they viewed it, how they viewed it, what action

9    they took based upon that representation or even that it was

10   any of the representations that have been listed in the

11   complaint.  In fact, they say it could have been perhaps a

12   similar statement, not even the one that they have listed in

13   the complaint.

14       So I think at that point we have to stop there and say

15   there isn't even a misrepresentation claim that could be

16   brought here, which means Your Honor actually at this stage

17   doesn't even have to get to the issue of whether the terms

18   would apply to Apple and its own conduct because that claim

19   has not been alleged and is not before the Court.

20           **THE COURT:**  Okay.

21           **MS. ORD:**  I'd be happy to touch on the individual

22   defects in the various other causes of action if this is the

23   appropriate spot to do it.

24           **THE COURT:**  With regard to Mr. Nagao's claims, he's

25   bound, governed by the Japanese terms, correct?

 1            **MS. ORD:**  Yes, Your Honor, that's --

 2            **THE COURT:**  Okay.  Your argument is overall

 3    Section 230 immunizes Apple against all the claims but --

 4            **MS. ORD:**  Correct.

 5            **THE COURT:**   -- in addition to that or alternatively,

 6    at least with regard to Mr. Nagao, he's governed by the

 7    Japanese terms, right?

 8            **MS. ORD:**  Yes, Your Honor.

 9            **THE COURT:**  Which means that Apple is not the

10    appropriate defendant for any claims that he might have.

11            **MS. ORD:**  That's correct, Your Honor.  Apple, Inc.,

12    the currently named defendant, is not the correct defendant.

13    It's not a mystery who the correct defendant is.  The name is

14    in his terms.  It's the Japanese entity.  And otherwise the

15    terms are exactly the same.  But the claim should be dismissed

16    because he has not sued the proper entity.

17            **THE COURT:**  Okay.  Okay.

18      I actually don't need to hear argument on the individual

19    causes of action.  It's really the two overarching preliminary

20    issues that I think are most critical here.

21      So how about if I hear from plaintiffs, and then

22    defendants get to respond since its their motion.

23            **MR. CONN:**  Thank you, Your Honor.

24      If it's all right with the Court, I'll be addressing the

25    CDA and the prospective waiver rights.  And my colleague will

```
 1    address Mr. Nagao's standing.
 2              THE COURT:  Okay.
 3              MR. CONN:  With respect to the overarching -- I guess
 4    with respect to the buckets the Court has put this into, we
 5    intend --
 6                        (Audio distortion.)
 7              THE COURT:  Your sound is not great.
 8              MR. CONN:  I apologize.  Is this better?
 9              THE COURT:  Yeah.
10              MR. CONN:  With respect to the -- the two buckets
11    that the Court had -- the claims into, I would say that there
12    is a third bucket, which would be the -- Apple's negligence in
13    failing to properly vet the claim.  But beyond that --
14              THE COURT:  I'm sorry, I -- I can't hear -- I didn't
15    understand that either.
16                        (Pause in the proceedings.)
17              THE COURT:  Mr. Conn, you're going to need to speak a
18    little more clearly.
19              MR. CONN:  I apologize, Your Honor.  We're all at
20    home quarantining right now with COVID.
21              THE COURT:  Oh, I'm sorry.
22              MR. CONN:  Your Honor, I would proffer that there's a
23    third bucket of claims as well which is Apple's failure to
24    recognize the -- and properly vet this specific app in
25    addition to its own misrepresentations or its liability for --
```

1    for the -- the app itself.

2        But as under the Communications Decency Act, the immunity

3    is limited to -- to, one, Apple's conduct as publisher, but

4    also by the statute itself.  It doesn't apply to -- to the --

5    half our causes of action.

6        Section 230(e)(1) says the statute has no effect on

7    criminal law.  Both of the federal statutes we raise are

8    criminal statutes.  Section 230(e)(4) says there's no effect

9    on communications privacy laws including the Communications

10   Privacy Act or any similar state law.  And --

11           **THE COURT:**  I'm sorry.  Which -- you're asserting two

12   criminal law violations against Apple?

13           **MR. CONN:**  Yes.  The -- the Electronic Communication

14   Privacy Act and the Computer Fraud and Abuse Act are both

15   federal criminal statutes.

16           **THE COURT:**  Huh.  I don't -- when they're asserted in

17   a civil case, we don't treat them as though they're criminal

18   statutes.  I mean, criminal statutes can only be enforced by

19   the government.

20       I look at those as -- as civil.  You're seeking civil

21   penalties, are you not?

22           **MR. CONN:**  We are.  But regardless the

23   Section 230(e)(4) explicitly exempts the Electronic

24   Communications Privacy Act from Section 230 immunity.

25           **THE COURT:**  Okay.  Okay.

1          **MR. CONN:**  Now, the remainder of the claims, we're

2     not seeking to hold Apple liable as a publisher, but we're

3     seeking to hold Apple liable for its own misrepresentations.

4     But that's clear in section -- paragraph 2 of the complaint

5     where we say specifically plaintiffs and class members rely on

6     Apple's longstanding campaign of representing that its App

7     Store is a safe and trusted place and download the Toast Plus

8     app.

9          **THE COURT:**  That's in paragraph 2 --

10         **MR. CONN:**  Yes.

11         **THE COURT:**  -- of the complaint?

12         **MR. CONN:**  Of the first amended complaint.

13         **THE COURT:**  Oh, of the first amended complaint.  Let

14     me pull that up.

15               (Pause in the proceedings.)

16         **THE COURT:**  Hmm.  Okay.

17         **MR. CONN:**  And so if you move on to paragraph 14 of

18     the complaint, we -- we explicitly identify one of the

19     misrepresentations that -- that remains today on the front of

20     the -- the App Store:  The App Store has proved for well over

21     a decade to be a safe and trusted place.  We offer nearly

22     2 million apps and we want you to feel good about using every

23     single one of them.

24        We've also alleged, and this has been an ongoing campaign

25     and per the *In re Tobacco* cases when consumers are exposed to

1   longstanding campaigns, the -- the requirements for -- for

2   pleading UCL for fraud are relaxed.  But we -- we have alleged

3   the who, what, where, when, why, and how of Apple.  The who

4   being Apple.  The what being this representation of absolute

5   safety for each and every single app.  The when and over the

6   past 10, 20 years.  And the how is set forth in the complaint.

7        But at the end of the day, what Apple is trying to argue

8   is that these Apple customers who've relied on this

9   longstanding campaign of Apple's absolute guarantee of safety

10  in its products and services, including each and every single

11  one on the app, who have suffered significant damages --

12  Mr. Nagao rendered hundreds of thousands to millions,

13  depending on the price of Ripple a day -- have absolutely no

14  recourse against Apple.

15       And -- and Apple's simply wrong.  Their waiver of

16  liability really fares no better.  It's longstanding in

17  California that the state statutes we sued under are

18  unwaivable.  The California Supreme Court in *McGill vs.*

19  *Citibank* case made clear you can't waive unfair competition

20  law or CLRA claims.

21       **THE COURT:**  Do you have -- do you have any cases you

22  can cite in which a court has found that Apple is responsible

23  for third-party apps who cheat the customers who purchase the

24  apps from the App Store?

25       **MR. CONN:**  Um, Your Honor --

```
 1                    (Simultaneous colloquy.)
 2          THE COURT:  I mean because Apple's involvement
 3    essentially was hosting this app on the App Store, making it
 4    available for purchase.  It does not appear to still be in the
 5    App Store.  At least I looked in the App Store yesterday and I
 6    couldn't find it.
 7       But so for a period of time, it hosted --
 8          MR. CONN:  And it guaranteed --
 9          THE COURT:  -- in its store.
10       Now where would I find -- where would I find any sort of
11    guarantee that everything that's sold in the App Store is
12    legitimate?
13          MR. CONN:  That -- on the front of the App Store.
14          THE COURT:  On the front of the App Store?
15          MR. CONN:  Yes, apple.com/app-store.
16       The representation that's set forth in paragraph 14 is the
17    first block of text.
18       "For over a decade, the App Store has proved to be a safe
19    and trusted place to discover and download apps.  But the
20    App Store is more than just a storefront, it's an innovative
21    destination focused on bringing you amazing experiences.  And
22    a big part of those experiences is ensuring that the apps we
23    offer are held to the highest standards for privacy, security,
24    and content.  Because we offer nearly 2 million apps, and we
25    want you to feel good about using every single one of them."
```

1           **THE COURT:**  Okay.

2           **MR. CONN:**  In fact, as we've alleged in 2007, Steve

3  Jobs said that the mission created in the App Store was to

4  create an advanced system which will offer developers broad

5  access to natively program the iPhone's amazing software

6  platform while at the same time --

7                  (Audio distortion.)

8           **MR. CONN:**  I'm sorry.

9    To natively program the iPhone's amazing software platform

10  while at the same time protecting users from malicious

11  programs.

12           **THE COURT:**  Um-hmm.

13           **MR. CONN:**  Apple didn't have to say every single one

14  of our apps will be safe, but they chose to.

15           **THE COURT:**  Did they -- did they say every single one

16  of our apps is safe?

17           **MR. CONN:**  We want you to be -- to feel good about

18  using every single one of them.

19           **THE COURT:**  But want to use -- so good about using

20  them is not the same thing as every single one of them is

21  safe.

22           **MR. CONN:**  In the context of that paragraph where

23  they said the app store is proved to be a safe and trusted

24  place, and the apps we offer are held to the highest standards

25  for privacy, security, and content.

1    **THE COURT:**  Okay.  Okay.

2    **MR. CONN:**  And so based off of these longstanding

3    campaigns of representations, we've alleged that the name

4    plaintiffs and the name class members purchased, used Apple

5    products, and downloaded this malicious app trusting it to be

6    safe because Apple said it was.  And they lost significant --

7    significant amount of money as a result.

8    **THE COURT:**  Okay.  All right.

9    **MR. CONN:**  Um --

10   **THE COURT:**  Anything with regard to the terms?

11   **MR. CONN:**  As for the -- nothing beyond the fact,

12   Your Honor, that we cite ample case law showing that you

13   simply can't waive these claims.

14       The only cases they've cited to the contrary were -- dealt

15   with a limited claim, whether a waiver -- or whether a

16   prospective waiver itself stayed a claim for

17   unconscionability.  And we have not brought a separate cause

18   of action for unconscionability.

19   **THE COURT:**  Okay.  All right.  Thank you.

20   **MR. CONN:**  Thank you, Your Honor.

21   **THE COURT:**  With regard to Mr. Nagao, what's your

22   argument?

23   **MR. CONN:**  I will let my co-counsel handle that one.

24   **THE COURT:**  All right.  Mr. Whitaker?

25   **MR. WHITAKER:**  Thank you, Your Honor.

1      It's very simple.  In fact, Mr. Nagao used the App Store

2  to download the app.  He relied on Apple's representations on

3  the App Store.  He used an Apple device.

4      At this stage, you know, the fact of the matter is, is

5  that Apple is the party that's hosting the application on its

6  server, not this JK Tunes Corporation.

7      So given the fact that -- that this case largely turns on

8  the fact that Apple represented that -- that two million apps

9  were safe and one of them caused our client to lose nearly a

10 million dollars, it's Apple's representations that this case

11 turns on.

12          **THE COURT:**  Okay.

13          **MR. WHITAKER:**  And the effect of -- the effect of

14 dismissal would effectively be -- I mean they're the same

15 terms.  He would still have to bring the case in California

16 against -- against what appears to be a Japanese entity.

17     The entity didn't make those representations.  The entity

18 did not host the app.  The entity did not fail to properly vet

19 the app or remove the dangerous app after it was on notice of

20 the dangerous condition.

21     I mean the -- the fact of the matter is, is that the --

22 the -- all of the nexus of the conduct at issue here was

23 Apple, not this Japanese entity.

24          **THE COURT:**  Hmm.  Okay.  All right.

25     All right.  Then brief response, Ms. Dew or Ms. Ord?

1          **MS. ORD:**  I'll start, Your Honor, if that's all

2     right.  And then Ms. Dew will close us out on the CDA

3     argument.

4          But briefly, I think Your Honor has correctly

5     conceptualized what's going on here.  You said there's no

6     guarantee, and that's right.  But it is a safe and secure

7     place.  We a hundred percent stand by those representations.

8          There's just nowhere in their complaint that meets the

9     bare minimum requirements of establishing that there's a false

10    statement or any of the requirements for Rule 9(b).

11         In the *Depot, Inc. v. Caring for Montanans* case, which is

12    a Ninth Circuit case, it's clear that they must state the

13    circumstances of the fraud including an account of the time,

14    place, and specific content of the false representation and

15    the identity of the parties to the misrepresentation, which

16    then brings us to this reliance issue.

17         And we're looking back at statements from Steve Jobs from

18    ten years ago.  Obviously nobody relied on those statements

19    from ten years ago.  They have to tell us what statement they

20    saw and why it was reasonable to rely upon it, and those facts

21    are just not present in the complaint.

22         The closest they come is paragraph 16 where they say on

23    information and belief that the plaintiffs saw representations

24    of safety and security or ones materially similar in content

25    to them.  But we don't know which ones they are, we don't know

 1    when, and we don't know any of the other circumstances about

 2    that.  And obviously --

 3         THE COURT:  I believe counsel pointed to

 4    paragraph 14.

 5         MS. ORD:  Yes, Your Honor.  Paragraph 14 has a

 6    general statement of what the App Store says which we stand

 7    by, but there's no allegation that any plaintiff actually saw

 8    those representations, those specific representations, when

 9    they did, or what action, if any, they took upon those

10    representations.

11         There's no allegation that they relied upon those

12    representations in entering into the App Store as a whole,

13    which is a safe and secure environment, or in deciding to

14    download this particular app.

15         And of course once they did download the app, they're

16    dealing with a third party and not with Apple anymore.

17         So there's just no reliance in this idea of somehow just

18    having statements out there for a long time that nobody ever

19    relied upon is not enough to state any claim, let alone to

20    satisfy Rule 9(b).

21         And in particular, Your Honor, you mentioned something

22    about something a purchase.  There is in fact no purchase

23    here.  The App Store where this app was present is free to

24    enter once you sign up for our terms, and this app was free to

25    download.  So this independently kills your CLRA claim because

1    there is no good or sale transaction.  And it kills the

2    restitution prong of the UCL because there's no money to

3    disgorge.  And as Your Honor correctly noted, the app is down,

4    so there's no basis for injunctive relief either.

5          **THE COURT:**  Hmm.  Okay.  All right.

6        Ms. Dew, on the CDA argument and Mr. Conn's suggestion

7    that Section 230 doesn't apply to the second cause of action?

8          **MS. DEW:**  Yes, Your Honor.  Thank you.

9        On that point, Your Honor, I think what's important and

10   what the case law tells us, both *Barnes* and its progeny, is

11   that you looked at the conduct alleged, not the specific

12   theory of liability under which it is alleged.

13       So what plaintiffs are trying to do here, as I understand,

14   is to use the Computer Fraud and Abuse Act and the Wiretap

15   Acts as a way of avoiding the -- the immunity afforded by the

16   CDA based on conduct that simply does not fit a claim under

17   those statutes, right?

18       There is no allegation here that Apple engaged in any

19   criminal conduct.  And as Your Honor rightly pointed out,

20   we're here in the context of a civil case.  This is not an

21   allegation that Apple has engaged in any criminal behavior.

22       There's no allegation that Apple actively participated in

23   any hack of any device whatsoever as required to state a claim

24   under the CFAA.  There's likewise no allegation that Apple

25   actually intercepted any of the cryptocurrency here.

1        To the contrary, plaintiffs concede that the

2    cryptocurrency was intercepted by, quote/unquote, thieves who

3    were the Toast Plus developers.  So plaintiffs cannot avoid

4    the effect of CDA immunity simply by trying to plead a claim

5    that is an ill fit for the conduct alleged here.

6        The conduct alleged here is that the plaintiffs downloaded

7    an app from the App Store.  That was their interaction with

8    Apple.  Subsequent to that interaction, they later, in a

9    separate transaction, uploaded the app -- the cryptocurrency

10   tokens directly into the third-party app.  And at that point

11   or at some later point, the developers of that app stole their

12   cryptocurrency.  It's a terrible and unfortunate circumstance,

13   but that is not -- it is not a circumstance for which Apple

14   can be held liable.

15       And, Your Honor, to the point just briefly where

16   plaintiffs allege that they have a failure to warn claim and

17   that should allow them to survive here and avoid the immunity

18   afforded by the CDA, failure to warn has also -- it's well

19   established that that is also something that is subject

20   with -- to the immunity afforded by the CDA because that's

21   precisely what the legislature wanted, interactive computer

22   providers to do here, they wanted them to take down these

23   apps, and so they had to find a way to avoid penalizing them

24   for not necessarily catching every app.

25       And if we look at the *Ripple Labs v. YouTube* case, Your

1   Honor, out of this court in 2020, the court found that CDA

2   immunity applied even though YouTube, the defendant there,

3   failed to take down allegedly fraudulent channels after being

4   notified that they were -- that they were fraudulent.  That is

5   precisely the same situation as plaintiffs' theory of

6   liability under a failure to warn here.

7        There is simply no allegation that Apple contributed to

8   the content of this app or that Apple participated in the

9   theft of plaintiffs' cryptocurrency.  And for that reason,

10  every single claim alleged here falls within the scope of CDA

11  immunity and the complaint must be dismissed.

12          **THE COURT:**  All right.  Thank you.

13       All right.  The matter stands submitted.  We'll issue a

14  written order.  Thank you.

15          **MR. CONN:**  Thank you, Your Honor.

16          **MS. ORD:**  Thank you.

17          **MS. DEW:**  Thank you, Your Honor.

18          **THE COURT:**  We're adjourned.

19          **MR. WHITAKER:**  Thank you, Your Honor.

20          (Proceedings were concluded at 3:07 P.M.)

21                          --o0o--

22

23

24

25

## CERTIFICATE OF REPORTER

      I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

_____

Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

Saturday, December 10, 2022